State of Maine                              Superior Court
Knox County, ss.                           Civil Action Docket No. 1908


Todd Conant, Thomas Ames,              )
Gregory Gould, Rodney Mason            )
and Karen Migliore, on behalf of       )
themselves and all others similarly    )
situated,                              )
                                       )
                    Plaintiffs,        )          **Complaint**
                                       )
            v.                         )
                                       )
FMC Corporation,                       )
                                       )
                    Defendant.         )


Plaintiffs Todd Conant, Thomas Ames, Gregory Gould, Rodney Mason, and Karen Migliore, on behalf of themselves and all other similarly situated workers, for their complaint against Defendant FMC Corporation ("FMC" or "Defendant"), state as follows:

## I.   Summary

1.      Plaintiffs Conant, Ames, Gould, Mason, and Migliore (the "Plaintiffs") and all those similarly situated ("Putative Plaintiffs") were employees of FMC, a large international chemical company, at FMC's seaweed processing plant at Crockett's Point in Rockland, Maine.

2.     For over two decades, both FMC's terms of employment and its established practice included provisions for paid vacations, including the term of employment and established practice of paying out all unused, accrued paid vacation time to employees upon cessation of employment. Employees who retired, whose positions were eliminated, or who separated from FMC for any reason—other than those who quit unilaterally or were terminated for cause—consistently received this paid vacation compensation.

3.     Plaintiffs Conant, Ames, Gould, Mason, and Migliore, and all others similarly situated, worked for FMC under a clear understanding that under the terms of their employment and established practice they would receive the accrued paid vacation they had been promised and counted on.

4.     But on November 1, 2017, when FMC sold its Health and Nutrition Division, including the Crockett's Point facility, to another large, international chemical company, DowDuPont, as part of a massive, multi-part deal designed to facilitate the Dow-DuPont merger, FMC failed to honor its long-held commitment about paid vacation to its employees.

5.     FMC refused to pay its Crockett's Point employees for the value of the paid vacation they had accrued at FMC from January 1, 2017 until the deal's close on November 1, 2017.

2

6.     Those Crockett's Point employees who became employees of DowDuPont on November 1, 2017 started their employment with no credit for any accrued paid vacation.

7.     As a result, FMC's former Crockett's Point employees lost the value of the ten months of paid vacation they had accrued from January 1, 2017 to October 31, 2017.

8.     In making this decision, FMC violated not only its long-established terms of employment and established practice with provisions for paid vacation, but also Maine law. Maine wage law expressly requires the seller of a business to either pay its former workers their paid vacation within two weeks of the sale or to secure the buyers' agreement to honor it. FMC did neither.

9.     Plaintiffs seek declaratory relief, unpaid wages, an additional amount equal to twice the amount of those wages as liquidated damages, and an award of costs, expenses, and attorneys' fees, for themselves and all similarly situated workers.

## II.     Jurisdiction and Venue

10.     This action arises under the Maine Wages and Medium of Payment laws, 26 M.R.S. §§ 621-A-629B.

3

11.     Venue properly lies in this Court under 14 M.R.S. §§ 501 through 508, because all Plaintiffs reside in Knox County, and Defendant had an established place of business in Knox County when the Plaintiffs' cause of action accrued.

12.     Jurisdiction properly lies in this Court under 4 M.R.S. § 105, based on the Superior Court's general civil jurisdiction.

### III.    Parties

13.     Under 26 M.R.S. § 626 and § 626-A, Plaintiffs were employees.

14.     Under 26 M.R.S. § 626 and § 626-A, FMC was the Plaintiffs' employer, or the seller of the business where they had been employed, or both.

### IV. Facts About Individual Plaintiffs

### Plaintiff Todd Conant

15.     Plaintiff Todd Conant is a resident of Rockport, Knox County, Maine. He was employed by FMC at its Rockland, Maine facility for about 26 years, from 1991 until the business's sale to DowDuPont in 2017, when he took a job working for the plant's new owner.

16.     Conant worked for a year-and-a-half in the plant's shipping and receiving department, a year in its main-line production department, seven years in its blending department, and seven years in its maintenance

4

department, rising quickly from "Tech 1" (the lowest position in the maintenance department) to "Tech 4" (the highest position in the maintenance department). Afterwards, he was promoted to a position as the plant-wide Health & Safety Representative, charged with overseeing safety compliance for all the plant's operations.

17.     Conant received consistently positive job evaluations throughout his tenure at FMC.

### Plaintiff Thomas Ames

18.     Plaintiff Thomas Ames is a resident of Owls Head, Knox County, Maine. He was employed FMC at its Rockland, Maine facility for about 27 years, from June 11, 1990 until the business's sale to DowDuPont in 2017, when he took a job working for the plant's new owner until his retirement in in April of 2018.

19.     Ames started at FMC as a maintenance trainee, rising from a position as a Tech 1 to a Tech 4 over the next several years. After securing an engineering license, Ames transferred to the boiler room in about 1998, where he worked to keep the plant's boilers and waste management systems operating safely and efficiently. He remained in this general role for the remainder of his time at FMC.

**Plaintiff Gregory Gould**

20.     Plaintiff Gregory Gould is a resident of Rockland, Knox County, Maine. He was employed by FMC at its Rockland, Maine facility for about 23 years, from September 1994 until the business's sale to DowDuPont in 2017, when he took a job working for the plant's new owner.

21.     Gould started at FMC as blending technician, performing tasks such as moving raw materials with a forklift and operating equipment used to extract carrageenan from seaweed. After about five years, he was transferred to a department that focused on the extraction of a different compound from seaweed, known as agarose. Gould continued working in the agarose department for the remainder of his time at FMC.

22.     Gould received consistently positive job evaluations throughout his tenure at FMC.

**Plaintiff Rodney Mason**

23.     Plaintiff Rodney Mason is a resident of Owls Head, Knox County, Maine. He was employed by FMC at its Rockland, Maine facility for about 27 years, from August 31, 1990 until the business's sale to DowDuPont in 2017, when he took a job working for the plant's new owner.

24.     Mason's first job at FMC was as a project engineer, working directly with customers to determine what to produce, and then modifying production processes accordingly. After about three years at FMC, Plaintiff

6

Mason was promoted to a position as a project engineering manager, overseeing a handful of other project engineers. After about eight years at FMC, he was promoted again, to a position managing project engineers, mechanics, electricians and others. While his exact management role and responsibilities changed over time, he remained in similar positions until the business's sale to DowDuPont in 2017, when he took a job working for the plant's new owner.

25.    Mason received consistently positive job evaluations throughout his tenure at FMC.

### Plaintiff Karen Migliore

26.    Plaintiff Karen Migliore is a resident of Union, Knox County, Maine. She was employed by FMC at its Rockland, Maine facility from April 24, 2000 until the facility's sale to DowDupont in November of 2017, when she took a job working for the plant's new owner.

27.    From 2000 until about 2005, Migliore worked in the facility's account payable department. From about 2005 until November of 2017, she worked as an accounting specialist in the facility's payroll department.

28.    Migliore received consistently positive job evaluations throughout her tenure at FMC.

## V. Facts About Defendant FMC Corporation

29.    Defendant FMC Corporation (FMC) is incorporated in Delaware.

30.    FMC's headquarters and its principal place of business are in Philadelphia, Pennsylvania.

31.    FMC has over 7,000 employees and sells products for crop protection, plant health, and professional pest and turf maintenance .

32.    From 1977 to 2017, FMC operated a major seafood processing facility on Crockett's Point, in Rockland, Maine, employing hundreds of Maine workers.

## VI.    General Facts

33.    In 1936, a food production company called Algin Corporation of America opened on Crockett's Point in Rockland, Maine.

34.    Soon after, it began extracting carrageenan from red seaweed. Carrageenan is a food additive used as a gelling, thickening, and stabilizing agent in products like ice cream, toothpaste, and salad dressing.

35.    Algin and a successor company, Marine Colloids Inc., continued carrageenan production on Crockett's Point through 1977.

36.    In 1977, FMC, a large international agricultural products company, purchased the Crockett's Point plant.

8

37.    FMC continued operations on Crockett's Point for the next forty years, incorporating the plant into its Nutrition & Health division. FMC also produced other additives at Crockett's Point.

38.    By the 1990s, FMC had both terms of employment and an established practice of providing paid vacation time to employees at Crockett's Point and its other U.S. facilities.

39.    Under this term of employment and established practice, employees "accrued" paid vacation time throughout a given calendar year. This time was not usable as time off—and thus not designated as "earned"—until January 1 of the following calendar year. Employees accrued paid vacation time on a pro rata basis throughout the year, for use starting January 1 of the following year.

40.    FMC management and employees used the phrases "accrued vacation" and "earned vacation" as terms of art with distinct, well-understood meanings, specific to FMC.

41.    The rate at which employees accrued this paid vacation time depended on the length of their tenure at FMC.

42.    Employees with 2 to 4 years of service accrued 2 weeks of paid vacation per year.

43.    Employees with 5 to 9 years of service accrued 3 weeks of paid vacation per year.

9

44.    Employees with 10 to 19 years of service accrued 4 weeks of paid vacation per year.

45.    Employees with 20 or more years of service accrued 5 weeks of paid vacation per year.

46.    Employees in their first two years at FMC accrued vacation time differently, but also began accruing vacation time immediately after starting work.

47.    FMC paid all departing employees the value of both their "earned" vacation time (which had accrued the year before the current calendar year) and their "accrued" vacation time (which had accrued the current calendar), with only two exceptions: employees who quit unilaterally and employees who were fired for cause,

48.    FMC calculated the value of vacation time based on the employee's regular rate of pay for a regular workweek, without any overtime.

49.    The distinction between "accrued" and "earned" vacation time, and the conditions for payment to departing employees, were confirmed in numerous FMC policies and internal documents, including the following:

a.    A Vacation Pay Policy for FMC employees made effective as of January 1, 2000, specified that all departing employees were entitled to pay for "earned" vacation time and that employees who retired or were "terminated by FMC for business reasons" were also entitled to pay for

10

"accrued" vacation time. The Vacation Pay Policy stated that it applied to FMC employees across the U.S., but that local worksites might issue policies to provide specifics not provided in the Vacation Pay Policy, such as site-specific accrual rates.

      b.    A "Retiring From FMC" policy available to FMC employees across the U.S. referred to "vacation earned in previous years" as "earned vacation," and referred to "vacation accrued in the current year" as "accrued vacation." It instructed employees that "accrued vacation" would "be paid to you in a lump sum in your final paycheck," whereas "earned vacation" could "be used to extend your retirement date or be paid out as a lump sum."

      c.    A spreadsheet titled "FMC Severance Benefits Calculation Worksheet," used by Human Resources officials to calculate the amount due in departing employees' final paychecks, included separate rows for "Accrued" vacation time and "Earned" vacation time. In the spreadsheet, "Accrued" vacation time referred to vacation time accumulated during the current calendar year, calculated pro-rata depending on the employee's departure date, whereas "Earned" vacation time referred to vacation time accumulated during previous calendar years but not yet used. The spreadsheet provided for full pay-outs for both Accrued and Earned vacation time upon separation.

    50.    FMC employees at Crockett's Point, including the Plaintiffs, understood that each day they came to work, they were earning additional

11

vacation time they would be able to use as of January 1 of the following calendar year.

51.    FMC employees at Crockett's Point, including the Plaintiffs, understood that if their employment ended for any reason other than termination for cause or unilateral quitting, they would be paid for the vacation time they had accrued from January 1 of the current calendar year through the date of their departure.

52.    Under this term of employment and established practice, FMC employees retiring from work at Crockett's Point were consistently and routinely paid the full value of both their earned and accrued paid vacation from at least the 1990s through 2017.

53.    Under this term of employment and established practice, FMC employees whose positions were eliminated were consistently and routinely paid out the full value of both their earned and accrued paid vacation time from at least the 1990s through 2017.

### FMC Sells Crockett's Point Plant to DuPont

54.    In March of 2017, FMC announced that it reached an agreement with DuPont, the international chemical company, under which DuPont would acquire FMC's Health & Nutrition division, FMC would acquire DuPont's Crop Protection division, and FMC would pay DuPont $1.2 billion

in cash and $425 million in working capital. The deal was structured as part of DuPont's proposed $75 billion merger with Dow Chemical Co., to form a new company, DowDuPont Inc.

55.     On July 27, 2017, FMC distributed an FAQ to its Crockett's Point workers, including the Plaintiffs, to provide information about the upcoming sale. In the FAQ, FMC informed Crockett's Point employees that it estimated the sale would close on November 1, 2017, and that, after the close, FMC would pay them the value of their "accrued" paid vacation.

56.     The FAQ also informed Crockett's Point employees that they would "remain employees of FMC with no change to compensation or benefits until the transaction closes."

57.     The sale of FMC's Health & Nutrition Division, including its Crockett's Point facility, closed on November 1, 2017.

58.     As of that date, FMC terminated the Plaintiffs and other Crockett's Point employees from employment with FMC.

### FMC Fails To Honor Its Obligation To Pay Accrued Vacation

59.     On about November 9, 2017, Plaintiffs and other former FMC Crockett's Point employees received a partial pay-out for their paid vacation. This pay-out included at least some payment for the employees' "earned" vacation (vacation they had accrued in 2016 or earlier), but did not include

any payment for their "accrued" vacation (vacation they had accrued from January 1, 2017 through October 31, 2017).

60.    In violation of their terms of employment, FMC's established practice, and Maine law, FMC did not pay Plaintiffs and other former FMC Crockett's Point employees any of the paid vacation they had accrued in 2017.

61.    DowDuPont informed Plaintiffs and other former FMC Crockett's Point employees hired by DowDuPont following the close of the sale that they would accrue paid vacation time on a monthly basis beginning on November 1, 2017, but that they would not receive any credit for vacation time accrued at FMC.

62.    By November 15, 2017, two weeks after the close of the sale, FMC still had not paid the Plaintiffs or other former FMC Crockett's Point employees any of the paid vacation they had accrued in 2017.

63.    When his employment with FMC was terminated, Plaintiff Conant had accrued 5/6 of the 5 weeks of annual vacation in 2017 provided for under his terms of employment and FMC's established paid vacation practice.

64.    Plaintiff Conant never received payment for any of this amount.

65.    When his employment with FMC was terminated, Plaintiff Ames had accrued 5/6 of the 5 weeks of annual vacation in 2017 provided for under his terms of employment and FMC's established paid vacation practice.

14

66.    Plaintiff Ames never received payment for any of this amount.

67.    When his employment with FMC was terminated, Plaintiff Gould had accrued 5/6 of the 5 weeks of annual vacation in 2017 provided for under his terms of employment and FMC's established paid vacation practice.

68.    Plaintiff Gould never received payment for any of this amount.

69.    When his employment with FMC was terminated, Plaintiff Mason had accrued 5/6 of the 5 weeks of annual vacation in 2017 provided for under his terms of employment and FMC's established paid vacation practice.

70.    Plaintiff Mason never received payment for any of this amount.

71.    When her employment with FMC was terminated, Plaintiff Migliore had accrued 5/6 of the 4 weeks of annual vacation in 2017 provided for under her terms of employment and FMC's established paid vacation practice.

72.    Plaintiff Migliore never received payment for any of this amount.

**Plaintiffs Demand Their Paid Vacation But FMC Still Fails To Pay**

73.    On March 1, 2019, Plaintiffs sent a letter— by email and USPS Certified Mail—to FMC, demanding payment of the value of the paid vacation they accrued from January 1, 2017 through October 31, 2017 by U.S. Certified Mail, both for themselves, and on behalf of all other workers similarly situated to them.

74.    As of March 11, 2019, FMC still had not made any payment to the Plaintiffs for the paid vacation they accrued from January 1, 2017 through October 31, 2017.

## VII.    Class Action Allegations

75.    Plaintiffs reallege and hereby incorporate by reference all the allegations contained above.

76.    Under Me. R. Civ. P. 23, Plaintiffs seek to bring a class action for wage theft in violation of 26 M.R.S. § 626, a provision of Maine's Wages and Medium of Payment laws.

77.    Plaintiffs seek to represent a class consisting of all persons who were employed by FMC in the state of Maine and whose employment with Defendant FMC was terminated as part of the 2017 sale of FMC's Health & Nutrition Division to DowDuPont.

78.    On information and belief, the class described in paragraph 77 includes over 100 employees.

79.    The class described in paragraph 77 is sufficiently numerous such that joinder of all persons in the class is impracticable, as required by Me. R. Civ. P. 23(a)(1).

80.     In selling its Maine operations to DowDuPont without paying its Maine employees for paid vacation time they accrued from January 1, 2017 through October 31, 2017, Defendant FMC violated 26 M.R.S. § 626.

81.     As required by Me. R. Civ. P. 23(a)(2), there are questions of law or fact, or both, common to the class, including but not limited to:

      a.     All putative class members were employees working for Defendant FMC in the state of Maine at the time of the close of the sale of the Defendant FMC's Health & Nutrition Division to DowDuPont.

      b.     All putative class members were terminated from their employment with FMC on or about November 1, 2017 to facilitate that sale;

      c.     All putative class members were injured by FMC's failure to pay its Maine employees terminated on November 1, 2017 the value of the paid vacation they accrued from January 1, 2017 through October 31, 2017;

      d.     All putative class members were injured by FMC's failure to enter into an agreement requiring the buyer of Defendant FMC's Health & Nutrition Division to pay the vacation time they accrued from January 1, through October 31, 2017.

82.     As required by Me. R. Civ. P. 23(a)(3), the claims of Plaintiffs are typical of the class they seek to represent.

83.     Plaintiffs and their counsel will fairly and adequately protect the interests of the class as required by Me. R. Civ. P. 23(a)(4).

84.     Under M. R. Civ. P. 23(b)(1)(A), class certification is appropriate because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudication with respect to individual members of the class, which would establish incompatible standards of conduct for the party opposing the class.

85.     Under Me. R. Civ. P. 23(b)(1)(B), class certification is appropriate because the prosecution of separate actions by individual members of the class would create a risk of adjudication with respect to individual members of the class which would as a practical matter substantially impair or impede their ability to protect their interests.

86.     Under Me. R. Civ. P. 23(b)(3), class certification is appropriate because the questions of law or fact, or both, common to the members of the class predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

87.     Maintenance of this action as a class action will promote the efficient administration of justice by obviating the need of numerous individual members to commence their own actions.

88.     Maintenance of this action as a class action will promote the equitable administration of justice since many individual members may not have the resources to independently retain counsel and since pursuing claims on an individual basis would be disproportionately expensive.

89.     Maintenance of this action as a class action is unlikely to impose burdens upon the Court other than those which would be encountered if the action were to proceed as an individual action on behalf of Plaintiffs.

## VIII.  Legal Claims

### Count I
### Wage Theft in Violation of 26 M.R.S. § 626

90.     Plaintiffs re-allege and hereby incorporate by reference all the allegations contained above.

91.     FMC was subject to the requirements of 26 M.R.S. § 626.

92.     Under 26 M.R.S. § 626, the seller of a business must pay—within two weeks of the sale—employees of that business any wages those employees earned while employed by the seller. Vacation pay has the same status as wages earned, so long as the terms of employment or the employer's established practice includes provisions for paid vacations.

93.     Until the close of the sale of its Health & Nutrition Division on November 1, 2017, FMC employed the Plaintiffs at its Crockett's Point facility in Rockland, Maine.

19

94.     Under the terms of employment and FMC's established paid vacation practice, Plaintiffs were entitled to receive payment for any paid vacation time they had accrued in the current calendar year if they were separated from employment for any reason other than because they quit unilaterally or because FMC fired them for cause.

95.     In violation of 26 M.R.S. § 626, FMC failed to pay the Plaintiffs within two weeks of the sale of the business for the paid vacation wages they had accrued from January 1, 2017 through October 31, 2017.

96.     FMC failed to remedy this violation even after receiving a demand for payment from the Plaintiffs on behalf of themselves and all similarly situated workers.

97.     More than eight days after the Plaintiffs made their demand, FMC still had not paid the Plaintiffs for the vacation they had accrued from January 1, 2017 through October 31, 2017.

98.     To remedy the violation of rights of Plaintiffs and other similarly situated persons, Plaintiffs request that the Court award them the relief prayed for below.

## IX.   Prayer For Relief

Plaintiffs, on behalf of themselves and all others similarly situated, request the following relief from this Court:

A.   An order of this Court declaring that FMC's failure to pay the Plaintiffs and all others similarly situated the paid vacation they accrued from January 1, 2017 through October 31, 2017 constituted wage theft in violation of 26 M.R.S. § 626;

B.   An order of this Court awarding Plaintiffs and all others similarly situated the value of their unpaid wages, in the form of the paid vacation they accrued from January 1, 2017 through October 31, 2017 but were never compensated for;

C.   An order of this Court awarding liquidated damages equal to twice the amount of their unpaid wages under 26 M.R.S. § 626 and 26 M.R.S. § 626-A;

D.   An order of this Court awarding interest, costs, and attorney fees;

E.   An order of this Court awarding such other relief as this Court deems just and proper.

Date:  March 11, 2019                    Respectfully submitted,

Carol J. Garvan (Maine Bar No. 4448)

Max I. Brooks (Maine Bar No. 5326)


David Webbert /Carol Garvan 4448

David G. Webbert (Maine Bar No. 7337)
Johnson, Webbert & Young, LLP
160 Capitol St., Suite 3
P.O. Box 79
Augusta, ME 04332-0079
Telephone:  (207) 623-5110
Email:  cgarvan@work.law
Email:  mbrooks@work.law
Email:  dwebbert@work.law

*Attorneys for Plaintiffs*